WILLIAM J. KELLY *et al.* Appellants, *vs.* EZRA C. FAHRNEY *et al.* Appellees.

*Opinion filed October 26, 1909—Petition stricken Dec. 8, 1909.*

1. APPEALS AND ERRORS—*the master's report does not have same force as a verdict.* In a chancery case the facts are found by the court, and the master's report, while *prima facie* correct, is of an advisory nature only, and does not have the force of the verdict of a jury in a suit where the trial by a jury is a matter of right.

2. SAME—*facts in a chancery case are open for consideration through progress of case.* The facts in a chancery case are open for consideration in the first instance by the trial court, and subsequently by the Appellate Court or the Supreme Court on appeal.

3. SAME—*question on appeal is whether decree was proper under the law and evidence.* Upon appeal to the Supreme Court in a chancery case the final question for determination is whether the decree rendered was the proper one under the law and the evidence, and if the proper result has been reached by the court below the decree will not be reversed because of alleged erroneous rulings as to particular findings of fact in the master's report.

4. CORPORATIONS—*when a stockholder is not liable for alleged wrecking of corporation.* Failure of a stockholder in a corporation to keep certain alleged agreements which it is claimed resulted in the wrecking of the corporation and the shrinkage in the value of complainant's stock is not ground for decreeing relief against him for such shrinkage, where the breach of such agreements was not the proximate cause of the ultimate failure of the company.

5. SAME—*what does not tend to show a conspiracy to wreck corporation.* The fact that certain stockholders, who were heavy creditors of the corporation, acted together in foreclosing their

liens in the United States Circuit Court after an illegal attempt
had been made by other stockholders to tie up the corporate prop-
erty by a long-time lease, does not tend to show any conspiracy
upon their part to wreck the corporation, and the decree of fore-
closure and sale in such proceeding, whether it is *res judicata* of
the question or not, is at least *prima facie* evidence that the action
was properly brought.

APPEAL from the Branch Appellate Court for the First
District;—heard in that court on appeal from the Circuit
Court of Cook county; the Hon. THOMAS G. WINDES,
Judge, presiding.

CHURCH & McMURDY, and ERNEST DALE OWEN, for
appellants.

VAIL & VETTE, and HENRY C. NOYES, for appellees.

Mr. JUSTICE VICKERS delivered the opinion of the court:

William J. Kelly and others, stockholders in the White
Cliffs Portland Cement and Chalk Company of Arkansas,
(a corporation which hereinafter will be referred to as the
White Cliffs Company,) filed a bill against Peter, Ezra C.
and William H. Fahrney and others for the purpose of
obtaining a decree against the defendants for the amount
of losses sustained by complainants by reason of the shrink-
age in value of the stock which complainants owned in the
White Cliffs Company, in consequence of certain alleged
fraudulent and unlawful acts of the defendants in respect
to the affairs of the White Cliffs Company. The Fahrneys
answered the bill, and the cause was referred to a master
with directions to take the evidence and report his findings.
The master reported the evidence and made findings favor-
able to the complainants. Exceptions to this report were
heard by the court below and a decree entered dismissing
the bill for want of equity. Upon appeal by complainants
to the Appellate Court for the First District the decree of

the circuit court was affirmed, and appellants have prosecuted a further appeal to this court.

The theory of the bill is that the Fahrneys entered into a conspiracy with certain other persons for the purpose of wrecking the White Cliffs Company, and that these acts were committed during the time the Fahrneys occupied a fiduciary relation to appellants and the other stockholders. The alleged object which the Fahrneys had was to so embarrass and wreck the White Cliffs Company as to enable them, in connection with certain other stockholders, to obtain the property and assets of said corporation for their own benefit, to the exclusion of appellants and other minority stockholders. The decree of the circuit court dismissing the bill for want of equity, as well as the judgment of the Appellate Court affirming the same, is based on the broad ground that the appellants failed to establish the allegations in respect to a fraudulent conspiracy contained in their bill.

The evidence shows that the Kellys organized the White Cliffs Company under the laws of Arkansas on December 16, 1893. The company was capitalized at $1,000,000, divided into 40,000 shares of $25 each. Of this stock $800,000 was common and $200,000 was treasury stock, with a provision in the charter for its preference. William J. Kelly subscribed for all of the common stock but four shares and John Kelly and Lewis Metesser each subscribed for two shares of the common stock. The incorporators made a return, under oath, that all of the common stock had been subscribed and paid for. These three men elected themselves directors, and elected Metesser as president, William J. Kelly secretary and John Kelly treasurer. The annual meeting of the stockholders was fixed by the charter on the first Monday of February in each year. The Kellys had acquired some sort of title or option to purchase a large body of land, consisting of about three thousand acres, in the State of Arkansas, on about nine hundred

acres of which was located a large and valuable deposit of white chalk, and adjoining the chalk deposit was a particular kind of clay, which, when mixed with the chalk, made a cement which was supposed to be equal to the best grade of portland cement. Whatever right or title the Kellys had to this land they turned over to the White Cliffs Company for the $800,000 of common stock. The evidence shows that the Kellys paid, or contracted to pay, about $40,000 for the land which they conveyed to the White Cliffs Company. It is conceded that the land has no value except its chalk and clay deposits above mentioned.

The Kellys sought to interest capital amongst business men in the south in their enterprise but did not succeed. They were indebted to David B. Coulter in the sum of $15,000 for part of the land which they conveyed to the White Cliffs Company. They gave Coulter a few shares of stock and made him a director in place of Metesser, who dropped out. They also owed a Mr. Kinsworth something over $4000 for land obtained from him. The Kellys did not have the money or the ability to raise it to develop the property. In October, 1895, William J. Kelly went to Chicago and met John W. Read, an old acquaintance of the Kellys. Read was employed as book-keeper for the Peter Fahrney & Sons Company. Kelly succeeded in interesting Read in his plan to erect a cement plant on the property of the White Cliffs Company. Read introduced Kelly to some of his friends, among them A. O. Cooper, then probate clerk of Cook county, the Fahrneys, and North & Taylor, bankers. Read was employed by Kelly and paid $50,000 in common stock for his work in inducing E. C. Fahrney to invest in the enterprise. Through the influence of Read, North & Taylor were induced to loan Kelly $9500 on his personal notes, secured by $100,000 of White Cliffs stock as collateral. On December 31, 1895, E. C. Fahrney purchased $25,000 of bonds of an issue of $125,000 of the White Cliffs Company, which bonds were secured by a trust

deed on the property of the company, and Kelly agreed that
Fahrney was to receive the $200,000 of stock which re-
mained in the treasury, as a bonus. Kelly employed Ernest
Dale Owen to draw up the bonds, for which work and other
general assistance rendered by Mr. Owen, Kelly gave him
$25,000 in stock. The Title Guarantee and Trust Company
of Chicago was made trustee under the trust deed. Kelly
sold North & Taylor five bonds at par and borrowed $25,000
on behalf of the company, and pledged as collateral $50,000
of bonds with said firm. The Kellys claim that at the time
E. C. Fahrney subscribed for the $25,000 in bonds he
agreed to loan the White Cliffs Company $75,000, which
was to mature at the same time the bonds became due.
Fahrney denies having promised to loan the $75,000, and
one of the controverted questions of fact in the case is
whether such promise was, in fact, made by Fahrney. Ap-
pellants contend that the refusal and failure of the Fahrneys
to make the loan of $75,000 was one of the acts designed
to hamper and embarrass the White Cliffs Company, with
the ultimate object of wrecking the company for the bene-
fit and advantage of appellees. After the money realized
from the sale of bonds had been exhausted Kelly went to
Chicago and demanded of Fahrney the $75,000, and was
told by Fahrney that the money could not be had from
Fahrney's father except on the condition that the control
of the company be given to the Fahrneys. The master in
chancery found that Fahrney did promise to make the $75,-
000 loan. The circuit court overruled an exception to this
finding of the master, but the Appellate Court, upon a re-
view of the evidence, found that Fahrney never made any
promise to loan the company $75,000. The evidence in the
record is in irreconcilable conflict in regard to this allega-
tion in the bill.

About the time of Kelly's visit to Chicago in connection
with the $75,000 loan he opened negotiations with a Mr.
Edenborn, of St. Louis, who finally agreed to, and did,

loan $50,000 to the White Cliffs Company for one year at six per cent interest and took a second mortgage on the property, and in addition received $300,000 of stock which was assigned to him as a bonus, and he also received $300,-000 of stock as collateral security. It is alleged in the bill that when the Fahrneys learned of the Edenborn deal they tried to prevent it. Kelly claims that Fahrney offered him $40,000 in cash and to put $60,000 in the company if Kelly would give him the $300,000 of stock he had agreed to give Edenborn. This offer, if ever made, was rejected, and the reason which Kelly gives is that he had already signed up a written agreement with Edenborn, which could not be canceled. After the Edenborn deal was consummated he was made a director instead of Coulter, who had resigned. William J. Kelly then resigned as president and Edenborn was elected to that office and William J. Kelly was elected secretary. At this time there was no apparent antagonism between the Fahrneys and the Kellys in respect to the management of the corporate affairs. W. H. and E. C. Fahrney were present at the time Edenborn was made a director and president and participated in electing him to these positions. They also ratified the execution of the mortgage and note to Edenborn and were in full accord with the efforts being made to put the corporation on a paying basis.

At the time Edenborn became president of the company the situation of the corporate affairs may be briefly summarized as follows: The company had issued $800,000 of stock to the Kellys for the land, which cost the Kellys not exceeding $41,000. It was claimed the Kellys expended $15,000 in development work. Of the money which the Kellys claim to have put into the enterprise, $2000 was borrowed and paid by E. C. Fahrney and has never, in fact, been repaid by the Kellys; $6000 was paid by Edenborn, and there was $10,000 due Coulter for land, which has never been paid, so that instead of the Kellys having put $41,000 plus $15,000 for development work, the net

amount put into the enterprise by the Kellys was approximately $38,000 all told. Peter and Ezra Fahrney had put in $115,000, which was represented by the bonds of the company. North & Taylor had bought $5000 of bonds. E. C. Fahrney had loaned the company $5500 on a note and Edenborn had loaned the company $50,000, making a total of cash paid into the treasury of $213,500. This money was expended under the management of the Kellys, except a part of the $50,000 loan by Edenborn was expended under his management. At this time the plant was incomplete and at best only had a capacity of about seventy-five barrels of cement per day. Edenborn completed a second kiln and started the plant in operation in June, 1897, and operated it between seven and eight months. He completed a warehouse for storing green cement, with a capacity of twenty thousand barrels. After Edenborn took charge of the affairs of the White Cliffs Company he found, upon investigation, that the company had a floating indebtedness amounting to over $31,000, which the Kellys had contracted prior to the time that Edenborn became connected with the company. Edenborn seems to have been totally ignorant of these corporate debts at the time he made his loan.

After attempting to operate the plant, as above stated, with very indifferent success, and after learning of the situation of the company financially, Edenborn became dissatisfied and was very anxious to sever his connection with the company and take his money back and surrender the stock and mortgage which he held. Edenborn claims that he was unable to make any profit by operating the plant. He frequently offered to sell his $50,000 note to E. C. Fahrney and turn over the stock which he held for the amount of money he had loaned, with six per cent interest. Fahrney did not want to purchase. He also sought to dispose of his interest through William J. Kelly, and offered to pay a commission if he would find someone to take his place.

Failing to get out of what he considered a bad trade in the manner above indicated, in the fall of 1897 Edenborn got the stockholders together in Chicago and urged upon them the necessity of providing more capital, and suggested that the property be bonded for $250,000, $115,000 of which was to be set aside to pay the Fahrney mortgage and $50,000 to pay the Edenborn mortgage. This proposition was favorably considered by the stockholders, and a large majority, of them signed an agreement to relinquish one-half of their stock, which was to be used as a bonus to aid in floating the new bond issue. The Fahrneys attended this meeting and agreed to surrender one-half of their stock holdings toward floating the new bonds. Edenborn was determined to get out of the concern and was using every means within his power to that end. William J. Kelly having a large stock bonus at his disposal, went east for the purpose of trying to negotiate a sale of the new issue of bonds. He met George Bartol, of Philadelphia, a cement man, and became acquainted also with J. de Goeijen, who was interested in a projected railroad in the State of Arkansas, one spur of which was built from Wilton to the bank of the Little river, opposite the works of the White Cliffs Company. Appellants charge that the Fahrneys entered into a combination with Edenborn which contemplated a re-organization of the White Cliffs Company in such way as to freeze out the Kellys. This charge is denied by appellees, and the evidence is held by the Appellate Court to be insufficient to sustain this contention.

The proposition of the stockholders to give one-half of their holdings as a bonus to float the $250,000 of bonds was abandoned by the stockholders, except it is claimed that E. C. Fahrney agreed that he would give of his stock $110,000 if Kelly would succeed in getting someone who would pay $100,000 of money into the treasury for $100,000 of bonds. This agreement, however, was never carried out, and whether it was, in fact, made it is not material now to

inquire. J. de Goeijen made a number of visits in the early part of 1898 to the White Cliffs Company's property with a view of investing in the new bond issue. In February, 1898, the corporation took the necessary legal steps to issue $250,000 of ten-year six per cent bonds, to be secured by a trust deed which is referred to in the record as the consolidated mortgage. At the time this loan was authorized it was understood and agreed that the Fahrney mortgage for $115,000 was to be paid, and the Edenborn mortgage for $50,000 and E. C. Fahrney's note for $5500 were also to be paid. At this time it is contended that Bartol had agreed to take all or a substantial part of the consolidated mortgage bonds. Bartol did not take any of said bonds. He did, however, make a loan of $10,000 to the company, and E. C. Fahrney surrendered ten $1000 bonds which he held as collateral, to enable the company to secure Bartol's $10,000 loan. During the time of these transactions the relation between William J. Kelly and E. C. Fahrney, seems to have been quite intimate and pleasant. Kelly had borrowed for his personal expenses from E. C. Fahrney several small sums, running from $50 to $100. It is alleged by the Kellys that the Fahrneys used their influence to prevent Bartol from entering into a contract by which he was to purchase the consolidated bonds. There is not sufficient proof in the record to sustain this charge. When the stockholders met, in February, 1898, to authorize the $250,000 loan, E. C. Fahrney attended the meeting and acted with the other stockholders in authorizing the issue of the bonds, with the expectation that Bartol would become the purchaser of said bonds. Inasmuch as this scheme contemplated the payment in full of all the indebtedness the Fahrneys had against the White Cliffs Company and which they were manifestly anxious to have paid, it is difficult to believe that they would secretly try to prevent Bartol's investing in the bonds when they would thereby be deprived of the money due them.

Up to the time of the meeting at White Cliffs on February 21, 1898, there was no indication of unpleasantness between the Kellys and Fahrneys. Fahrney was induced to attend the stockholders' meeting in Arkansas, as he supposed, to promote the best interest of all of the stockholders. After the business was transacted and the meeting adjourned, at about eleven o'clock P. M. the sheriff served E. C. Fahrney with process in three cases which had been secretly instituted by W. J. Kelly against him in Arkansas. Fahrney had no intimation that any suits had been commenced against him, or that there was any intention to commence any such suits, prior to the time the sheriff served him with process. At the same time the sheriff served an attachment writ on Fahrney and levied on all of his stock. One of these suits was for damages claimed by Kelly resulting from the alleged failure of Fahrney to make the $75,000 loan. Another was for an alleged breach of the agreement which it is claimed Fahrney made to give $110,000 of his stock as a bonus if $100,000 in cash was procured by Kelly from the sale of bonds and placed in the treasury. The third suit was a bill in equity to compel the specific performance of the alleged $110,000 stock agreement. After Fahrney had been served with these papers he asked W. J. Kelly what all these suits meant. Kelly told him to go to Richmond and find out. Richmond was the county seat, twenty miles away through the woods. So far as the record discloses, the institution of these several suits by Kelly against Fahrney was the first act of hostility between the Kellys and Fahrneys. It is not necessary for our present purposes to trace the subsequent progress of the litigation which followed between Kelly as plaintiff and Fahrney as defendant. These were personal actions between the parties, and the only purpose which they serve in the present litigation is to show the feelings and motives of the parties in connection with the subsequent conduct of each in regard to the affairs of the White Cliffs Company.

Suffice it to say that these several suits, as well as others brought by Kelly against Fahrney, were all finally terminated adversely to Kelly.

For some reason the Bartol deal was not consummated, but in May, 1898, J. de Goeijen again, visited White Cliffs and purchased 108 of the consolidated bonds at par and received a bonus in stock of $502,500. The arrangement with J. de Goeijen was made by Kelly without the knowledge or consent of the Fahrneys. Kelly and J. de Goeijen having a majority of the stock, controlled the company. Fahrney was not consulted, and, so far as the evidence shows, had no communication with J. de Goeijen until December 26, 1899. On that date McDougall Hawkes, who represented J. de Goeijen's interest, telegraphed the Fahrneys from New York asking for a meeting in Chicago. Out of the $108,000 received from J. de Goeijen, Edenborn's $50,000 had been paid, but Fahrney's note for $5500, which was secured by the same mortgage, was not paid. The remainder of the $108,000 was expended under the Kelly and J. de Goeijen management. J. de Goeijen was, in fact, the representative of a syndicate of investors who resided in Holland. The plant was operated at a loss and the company was soon in a critical and desperate financial condition again. In the meantime J. de Goeijen became dissatisfied with Kelly's management and sent an expert cement maker from Holland to take charge of the plant. The expert arrived at White Cliffs and commenced work. He received mail addressed to him from Holland as superintendent. Kelly discharged him and continued in full charge of the plant himself. In order to get out of the concern J. de Goeijen gave Kelly an option on his interests, by which he agreed to sell to Kelly for the principal and five per cent interest. The option agreement provided that if the Kellys were unable to avail themselves of the option by January 1, 1900, they were to withdraw from the management of the property. The company was in hard lines for money.

Kelly attempted to raise $12,000 by hypothecating $27,000 of bonds with the Title Guarantee and Trust Company, but this deal was prevented by J. de Goeijen. The Fahrneys had no connection with the transaction and it does not appear that they had any notice that such a deal was on foot. The $5500 note, which was secured by the Edenborn mortgage, was past due, and there was a default in the payment of interest on the $115,000 of bonds which the Fahrneys held. On July 13, 1897, a bill was filed in the State court of Arkansas to foreclose for the $5500 note. This suit was transferred to the United States Circuit Court and there consolidated with a suit that J. de Goeijen had commenced to foreclose on his $108,000 mortgage. It must be borne in mind that the Fahrneys held the first mortgage on all of the company's property to secure the $115,000 due upon the first mortgage bonds. As holders of this first lien they had a right to foreclose it any time after a default for a period of six months in the payment of interest.

With two suits to foreclose pending and a probability that the Fahrneys would institute another to foreclose their prior lien, Kelly resorted to the expedient of leasing the White Cliffs Company's property for a period of ten years. A corporation was organized under the laws of Arkansas, known as the Arkansas Portland Cement and Chalk Company, with a capital of $40,000. A meeting of the stockholders was called and a lease executed by W. J. Kelly as president and attested by John Kelly as secretary, leasing all of the property of the White Cliffs Company to the Arkansas Portland Cement and Chalk Company for a period of five years, with a renewal option for five years more, at an annual rental of $20,000. Kelly's theory appears to have been that the $20,000 would pay the fixed interest charges against the company and thus prevent foreclosures. It afterwards developed that all of the proceedings pertaining to the leasing of the property were illegal and void, for the reason that less than a majority of the stockholders

participated in the meeting at which the pretended trans-
action was had. It was after the Kellys had made this
illegal attempt to tie up the property by a long-time lease
that J. de Goeijen and the Fahrneys commenced to act in
concert for the purpose of collecting their respective debts
against the company. A bill was filed to set aside the lease,
which resulted in a decree being entered canceling it. The
Fahrneys filed a bill to foreclose their $115,000 mortgage.
These bills to foreclose were prosecuted to a decree after
being consolidated with the foreclosure proceeding insti-
tuted by J. de Goeijen. Under the decree entered in the
consolidated suit on May 17, 1901, the property was sold
on August 3, 1901. At the sale the Fahrneys bid $150,000.
A representative of J. de Goeijen bid $160,000 and the prop-
erty was struck off to him. On August 20, 1901, the sale
was reported to and confirmed by the court. The Fahrneys
obtained a return of the money they had loaned it and
thereafter had no further connection with the White Cliffs
Company.

It will be seen from the foregoing statement that all of
the questions involved are disputed matters of fact. Ap-
pellants' contention that Fahrney agreed to make a loan of
$75,000 to the company is the subject of a sharp conflict in
the evidence. We agree with the Appellate Court that
there is not a clear preponderance of the evidence on this
question in favor of appellants' contention. But even if it
was proven, as charged, that Fahrney did agree to make
this loan and afterwards refused to consummate it, it does
not follow that appellants are entitled to the relief sought
by this bill. At the time Kelly called on Fahrney for the
$75,000 he was negotiating with Edenborn for a loan for
the same amount and succeeded soon afterwards in obtain-
ing $50,000 from him, and later he obtained $108,000 from
J. de Goeijen on practically the same terms he had offered
Fahrney. In this way $158,000 was obtained and expended
in an effort to make the White Cliffs Company pay. While

this money was not obtained at the time Kelly wanted the $75,000 of Fahrney, it came in before the operation of the plant was suspended or before any of the creditors had commenced foreclosure proceedings. If Kelly was unable to make a success of the White Cliffs Company with $158,000, it is difficult to see how a failure to obtain $75,000 was the cause of the financial disaster that overtook the enterprise. Unless the failure of the Fahrneys to make the loan was the proximate cause of the ultimate failure of the company, clearly the appellants would have no standing in a court of equity to compel the Fahrneys to make good the loss sustained by the shrinkage in the value of their stock.

The observations already made in regard to the failure to make the $75,000 loan will also serve as an answer to the alleged interference of the Fahrneys to prevent the making of the Bartol deal. Had the $75,000 been loaned by the Fahrneys or if Bartol had taken the bonds instead of J. de Goeijen, there is no reason to believe that the course of the affairs of the White Cliffs Company would have been any different from what it was when operating on the money of Edenborn and J. de Goeijen.

The charge in the bill that Fahrney agreed to give $110,000 of his stock as a bonus to anyone whom Kelly would induce to put $100,000 into the company on the consolidated bonds is not sustained by the evidence, and if it were it would not warrant a court of equity in granting appellants the relief sought by this bill. If Kelly had controlled the $110,000 of stock which he claims Fahrney promised to donate as a bonus, it is not shown that Kelly could have raised a dollar more money than he succeeded in raising with the stock and bonds which he was able to control. In other words, it is not shown that Kelly had any opportunity to obtain money which he did not obtain because he did not have stock enough under his control to put up as a bonus or collateral. When the Edenborn loan was made Kelly had all the stock that was necessary to put that

deal through, and when Edenborn was paid off and released the $600,000 which he held it enabled Kelly to put the same up with J. de Goeijen by way of inducement to him. It follows that if it were shown that Fahrney agreed to put up this stock and afterwards refused to do so, his failure in that regard did not bring about the financial collapse of the White Cliffs Company.

The charge in the bill that there was a conspiracy between the Fahrneys and J. de Goeijen to wreck the company for their own benefit is wholly unsupported by the evidence. It is true that after the Kellys placed an illegal and fraudulent lease upon the entire property, running for five years, Fahrney and J. de Goeijen, as creditors of the company, acted together in obtaining a decree setting aside the lease and foreclosing their respective liens, but they were simply acting within their clear legal rights and influenced by no other motive than to collect the money that was justly due them. Their legal right to a decree of foreclosure and a sale of the property was established by the decree of the United States Circuit Court, and whether the question is *res judicata* or not, the rendition of the decree is at least *prima facie* evidence that the action was properly brought.

Finally, it may be pointed out as a conclusive reason why appellants' contention that the Fahrneys were seeking to obtain control of the company cannot be sustained, that when the property was offered for sale and an opportunity afforded the Fahrneys to buy it for much less than it was supposed to be worth, they only bid enough to secure their own debt and interest and the costs and expenses they had incurred and allowed J. de Goeijen to obtain title to the entire property for $160,000. The probability is that if it had not been for the bids of the alleged conspirators the property of the White Cliffs Company would have sold for very much less than $160,000. It is not recorded that anybody else wanted the property at any price.

The points already discussed are the principal ones re-lied on by appellants as furnishing a basis for the relief sought. There are some other matters of minor importance which we do not deem it necessary to discuss. There is no warrant in this evidence for a decree requiring the Fahr-neys to respond to Kelly and his co-complainants for the loss in the value of their stock.

Appellants contend that on the controverted questions of fact the master in chancery to whom the cause was re-ferred found in their favor, and that his findings should not be set aside unless they are clearly against the prepon-derance of the evidence. This is not the law. This court has never adopted the rule that the master's report is to be given the same effect as the verdict of the jury in a case where the parties have the right to have the issues of fact determined by a jury. In a chancery case the facts are found by the court, and the master's report, while *prima facie* correct, is of an advisory nature only. The facts are all open for the consideration, in the first instance, by the trial court, and afterwards by the Appellate or this court in case of an appeal. (*Fairbury Agricultural Board* v. *Holly,* 169 Ill. 9; *Wolfe* v. *Bradberry,* 140 id. 578; *Henderson* v. *Harness,* 184 id. 520.) Without regard to the finding of the master upon any particular question of fact, the ulti-mate and final question in this court is, was the decree ren-dered by the court the proper one under the law and the evidence? If the proper result has been obtained in the court below the decree will not be reversed in this court because of alleged erroneous rulings on exceptions to the master's report.

Finding no error in this record the judgment of the Appellate Court for the First District is affirmed.

*Judgment affirmed.*