(No. 35885.—

FRANCES UKSAS, Appellee, *vs.* MARIE ZELENSKY *et al.,* Appellants.

*Opinion filed February 15, 1961.*

304

HERMAN R. TAVINS, of Chicago, for appellants.

TAGE JORANSON, and FRANK A. KARABA, both of Chicago, for appellee.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

Defendants, Marie Zelensky and John Zelensky, have appealed directly to this court from a decree of the chancellor of the superior court of Cook County overruling the master's report and requiring defendants to convey to plaintiff certain property allegedly acquired from plaintiff by false representations and undue influence.

The essential issue is whether the findings and conclusions of the chancellor, overruling those of the master, who saw and heard the witnesses, are supported by the evidence and in accordance with law.

In reviewing the record, it appears that there are certain uncontroverted facts. Plaintiff, age 67 at the date of the trial, came to the United States from Lithuania in 1909, and has been a citizen for the past fifteen years. On August 23, 1913, she married Joseph Uksas, a widower who had a nine-year-old child, the defendant Marie Zelensky. Plaintiff and Uksas had two other children who died in childhood. When Marie was fourteen years old she went to work and gave her earnings to her father. She lived with her father and plaintiff until she married John Zelensky on February 2, 1922. They continued the close family relationship which had obtained through the years, whereby plaintiff treated Marie as her daughter and Marie treated plaintiff as though she were her real mother, according to the testimony of all the parties, as well as that of Della Winkus, plaintiff's sister, who lived with the family since 1916. They all visited frequently, and John Zelensky helped with repairs and maintenance of the family home.

In July, 1924, plaintiff and her husband, Joseph Uksas, purchased as joint tenants a vacant lot located at 4512 S. Washtenaw Avenue in Chicago, on which they constructed a two-flat brick building and a two-car frame garage. Plaintiff, her husband, and her sister occupied the first floor, and the upper floor was rented. Plaintiff was employed during most of her married life, and was a janitress or maid in a hotel on Michigan Avenue for some 19½ years. Joseph Uksas was also employed, and they put their savings in joint accounts. At the date of the death of Joseph Uksas on February 10, 1957, at the age of 81, these savings accounts included $2,700 in Columbus Building & Loan Association, $6,050 in Brighton Savings & Loan Association, and $2,440 in Standard Savings & Loan Association. The

flat building had a valuation of approximately $18,000 and was free of encumbrances. Joseph Uksas left surviving as his heirs-at-law his widow, the plaintiff herein, and his daughter, Marie Zelensky, hereinafter referred to as the defendant.

It appears further that plaintiff gave defendant the savings account books the evening of the day Joseph Uksas died, and that two days later, February 12, 1957, they were driven by the granddaughter (defendant's daughter) to the offices of the savings and loan associations, where plaintiff closed the accounts and obtained checks payable to herself for all the monies on deposit. Plaintiff then asked defendant to hold the unendorsed checks at her home so that plaintiff's sister would not know about them. On February 18, 1957, plaintiff and defendant were driven by the granddaughter to the Public Savings & Loan Association and to Talman Federal Savings & Loan Association, where joint accounts were opened in the names of plaintiff and defendant. Plaintiff also went to the Western & Southern Life Insurance Company, where she changed the beneficiary on her $1,000 life insurance policy, dated August 11, 1925, from her husband to defendant.

The evidence is controverted respecting the motivation and circumstances surrounding the creation of these joint accounts and the joint tenancy in the property. Plaintiff claims she took the money out of the three "bank accounts" because Marie said the government would close them up. She testified that she spoke very little English, that she didn't know that Marie and she were on the accounts, that Marie told her they were to check on the real estate and she brought the house papers to the bank; that nobody at the banks talked to her; that she didn't know what a deed was or what joint tenancy means.

On cross-examination, however, plaintiff explained that she and her husband bought the property together in joint tenancy, and that she held the papers. If he died, she owned

it, and if she died he owned it, and that they had everything that way, including their savings accounts. With respect to her knowledge of English, it appeared from her testimony as an adverse witness that she had voted in elections, travelled to work and shopped alone, and that her supervisors at work over the years spoke to her only in English. Moreover, the granddaughter, age 33, testified that plaintiff always spoke to her in English, and that she read American newspapers.

In sharp contrast to plaintiff's account of the events, defendant testified that when plaintiff first gave her the "bank books," plaintiff said that she wanted the money taken out and put in both names, and that when defendant returned "the papers," plaintiff said "Now is a good time to have the title put on me and you." Defendant explained that her stepmother said that she wanted Marie to have everything when she (plaintiff) died, and that the joint accounts were opened at plaintiff's request, and according to the plan which plaintiff and her father had discussed in her presence on several specific occasions. They had agreed that when Joseph Uksas died plaintiff would then hold the property with Marie, who would take care of plaintiff, and that on her death all of the property would go to Marie. Although plaintiff denied any such family discussions, she did admit that it was agreed that the property was to go to Marie after plaintiff died.

William Ropa, an executive officer at Public Savings & Loan Association, testified on defendant's behalf. He stated that plaintiff told him that she wanted a savings account in joint tenancy with her stepdaughter, and that he asked the office girl to bring the necessary forms. He had seen defendant in the institution previously, but did not know her personally and had no previous knowledge of the purpose for which plaintiff and defendant were there. While he could not recall the exact conversation, he did remember that plaintiff spoke to him in English and looked at the joint account cards before she signed them, and that she also wanted a

joint tenancy on the property with her daughter. "Mrs. Uksas wanted Mrs. Zelensky to have all the real estate on her death—that sticks in my mind." He spent about an hour talking to them about the joint accounts and the joint tenancy.

Walter Rojek, the association attorney to whom plaintiff and defendant were referred in connection with the deeds, also testified on defendant's behalf. He said that he first answered plaintiff's inquiries about her rights to the contents of a safety deposit box which her husband had held with her sister, and then explained to plaintiff that if she placed the property in joint tenancy the survivor would get the property, and that she could never sell it unless her daughter and son-in-law joined in the conveyance. After the entire conversation, which extended for about 45 minutes, he asked her whether she wanted a joint tenancy. She indicated that she did, and said that they had all worked for the property. His notes of this discussion, made in the course of business in order to prepare the papers, were available at the trial. He testified further on cross-examination that all the conversation with plaintiff was in English, and that she "understands it very well."

Quitclaim deeds were prepared under his supervision, whereby the property was conveyed by plaintiff to a spinster, who, in turn, conveyed it to plaintiff and defendant in joint tenancy. A fee of $125 for preparing the documents was paid by defendant. She was subsequently paid this exact amount by plaintiff, who at first denied giving the money and then claimed that it was a gift.

The manager of special services who prepared the signature cards at Talman Federal Savings & Loan Association testified that she talked to both plaintiff and defendant in English, and that there was no need to request language assistance from the employees available for such purpose.

Following the creation of the joint accounts and joint tenancy, the parties continued their close relationship. Ac-

cording to plaintiff's admission, defendant and her husband drove plaintiff everywhere, and defendant's husband helped with the house repairs. In April, plaintiff gave $25 to each of defendant's children, and gave the $125 to defendant. Plans were made, according to the testimony of defendants and their daughter, for the rental of the upstairs apartment by the daughter and her husband. They had formerly lived there and paid rent before the husband was called to army duty in the Korean War. The apartment was to be vacated by the Vaicaitis family, who had been tenants for approximately 2½ years.

Anthony Vaicaitis was a Lithuanian who came to this country in 1950. He and his wife moved from plaintiff's upstairs flat to a $25,000 home. Della Winkus, plaintiff's sister, contributed $18,000 of that purchase price, believing that she held joint title. However, Vaicaitis testified that title was in his name alone, and that he had only signed some paper agreeing to take care of her for her lifetime.

Plaintiff visited her sister in the Vaicaitis home several times, and admitted that she liked it there and would like to do as her sister had done. In July, 1957, she suddenly cancelled the arrangement for the rental of the apartment to the granddaughter, and rented it instead to Vaicaitis's brother. She complained for the first time about the joint accounts and the joint tenancy, and asked defendant for the account books. Defendant, who at no time had withdrawn any of the money on her own behalf, gave plaintiff one of the accounts books, and said that the other was put away. Defendant claims that plaintiff said to "leave it stay there," but shortly thereafter defendant received a request for the book from plaintiff's original attorney, who subsequently withdrew from the case. Defendant promptly gave him the book, and, at his request, signed a letter relinquishing any claim to the savings accounts. She refused, however, to execute the quitclaim deeds to plaintiff.

On the basis of substantially the foregoing evidence

the master made certain findings supporting defendants' theory of the case. He concluded that at the time plaintiff opened the savings accounts and conveyed the title to the real estate she well understood that she and her stepdaughter held title in joint tenancy and understood the legal effect of the documents which she signed. The master further concluded that there was no evidence that plaintiff was over-reached or defrauded in any way, but that she apparently changed her mind between February 10, 1957, when the plan was initiated, and September 1, 1957, when she asked for the return of the savings account books and the property. He found it significant that this occurred after her sister had contributed $18,000 of her life savings to Vaicaitis for the purchase of a home, to which she mistakenly believed she had joint title. Consequently, since the material allegations of the complaint were not proved, the master recommended that the decree find the real estate is owned in fee simple by the plaintiff and the defendant, and that while the equities with respect to the accounts were with defendants, since she renounced any claim thereto that was a moot question.

The chancellor, after hearing the argument of plaintiff's counsel on the exceptions to the master's report, took the case under advisement without giving defendants an opportunity to argue their position. On the basis of the record he rejected the master's findings, summarily concluded that the evidence established plaintiff's allegations, and entered a decree requiring defendants to quitclaim their interest to plaintiff.

In determining the propriety of that decree we must consider the weight to be given the findings of the chancellor, and whether they were supported by the evidence. While it is generally agreed that where the chancellor has heard the evidence his findings will not be disturbed unless they are clearly and manifestly against the weight of the evidence (*Larson* v. *Glos,* 235 Ill. 584, 588; *Jones* v. *Koepke,* 387

Ill. 97, 107) where, however, as in the instant case, the master alone heard the evidence and the chancellor adjudicated the cause on the "frozen record," there is no such unanimity of expression in the case law. Under these circumstances, some decisions have applied the manifest weight rule if the chancellor approves the findings of the master (*Schmalzer* v. *Jamnik*, 407 Ill. 236; *Mruk* v. *Mruk*, 379 Ill. 394, 401; *Klekamp* v. *Klekamp*, 275 Ill. 98, 102; *McGlaughlin* v. *Pickerel*, 381 Ill. 574, 583; *Pasedach* v. *Auw*, 364 Ill. 491, 496); while others insist that all the facts are open for consideration on review, particularly if the chancellor rejects the master's findings. (*Stasch* v. *Stasch*, 355 Ill. 581, 583; *Jones* v. *Koepke*, 387 Ill. 97, 107; *Vesolowski* v. *Vesolowski*, 403 Ill. 284; *Zilvitis* v. *Szczudlo*, 409 Ill. 252; *Chechik* v. *Koletsky*, 311 Ill. 433; *Kosakowski* v. *Bagdon*, 369 Ill. 252, 258; *Kelly* v. *Fahrney*, 242 Ill. 240; *Fairbury Union Agricultural Bd.* v. *Holly*, 169 Ill. 9; *Thatcher* v. *Kramer*, 347 Ill. 601). These decisions reiterate the rule that the master's report, while *prima facie* correct, is of an advisory nature, and that all the facts in a chancery case are open for consideration in the first instance by the trial court, and, in case of an appeal, by the reviewing court, where the ultimate question is, "Was the decree rendered by the court a proper one under the law and the evidence?"

Inasmuch as the chancellor herein did not hear the evidence and rejected the master's findings, we find apposite the comment of the court in the *Kosakowski case* at p. 285: "The master, who saw and heard the witnesses testify, found for appellant. The chancellor, without hearing any evidence, sustained exceptions to the master's findings of facts and entered a decree for appellee, Bagdon. While the rule is that the master's findings on controverted facts do not carry the weight of a jury verdict in a suit where trial by jury is a matter of right, yet such findings are advisory [citation], and thus are entitled to much consideration. The chancellor, in this case, had no better opportunity to judge

the credibility of witnesses than has this court on appeal, and all the facts are open for our consideration. [Citations.]"

In the light of this prevailing rule, it is our duty to make our own independent determination of the facts, giving due consideration to the findings of the master, who heard and saw the witnesses, since the factual conclusions here depend upon an appraisal of the credibility of conflicting testimony.

Plaintiff's allegations that she thought she alone owned the property, and that the joint accounts and the joint tenancy were executed because of defendant's undue influence and misrepresentations that the government would tie up the property or close the accounts otherwise, are supported solely by plaintiff's own testimony. Her statements that she did not understand the conversation in English at the time she signed the papers, or know what she was signing, and that no one at the "banks" spoke to her, is contradicted in a great measure by her own testimony and by that of disinterested witnesses, as well as by defendant.

Plaintiff's knowledge of English was certainly not as poor as she represented. The record shows she had been in this country since 1909, had been a citizen for over fifteen years, voted in elections, worked for over nineteen years as a maid in a hotel under supervisors who spoke only English, travelled about the city, paid her bills and made deposits and withdrawals in her savings accounts during the lifetime of her husband and thereafter. Moreover, all of her testimony and all of the questions were propounded in English. Significantly, she was also familiar with joint accounts and joint tenancy, since she and her husband had several joint savings accounts and held their property in joint tenancy. In fact, she even explained on the stand the survivorship aspect of joint tenancy.

Even greater doubt on the veracity of plaintiff's pro-

testations of lack of comprehension of the transaction was cast by the testimony of the executive officer and the attorney of the savings and loan association where the deed was executed. As hereinbefore noted, neither of them had prior knowledge of the purpose of plaintiff's visit to the association. Executive officer Ropa corroborated defendant's assertion that plaintiff herself asked to open a joint account with her stepdaughter, and noted that plaintiff spoke English and signed the cards in English after looking them over. He recalled that she also said that she wanted to be together with her stepdaughter in joint tenancy on some property, because Marie was the last daughter and she wanted everything she had to go to her. Furthermore, the association attorney, Rojek, to whom plaintiff and defendant were referred, testified that he discussed joint tenancy with plaintiff and her stepdaughter for some 45 minutes, and that after he had explained to plaintiff not only the survivorship aspect, but the fact that she could not sell the property without her stepdaughter's consent, she still wanted a joint tenancy with defendant, and remarked that they all had worked for the property. Rojek specifically stated that he thought plaintiff understood English well.

That evidence not only indicates that full disclosure was made to plaintiff by disinterested persons of the significance of her acts, and that she understood English, but shows that the joint tenancies were created at her request so that her stepdaughter, who had also worked for the property, would get it after plaintiff's death. Thus, she not only knew that defendant was on the title, and what that involved, but she wanted it that way. Such evidence clearly precludes any finding that plaintiff's action was prompted by defendant's misrepresentations or overreaching.

This conclusion is borne out further by the prior and subsequent conduct of the parties, and the entire sequence of events. The uncontroverted evidence indicates that until the time plaintiff's sister turned over her life savings to

Anthony Vaicaitis and moved into his home, this was a closely knit family. That close relationship, considered along with the circumstance that it was customary for persons in their way of life to hold and pass their property by joint accounts and joint tenancies, and the further evidence that plaintiff and her husband had always held their property that way, and that he apparently had urged her to make this same arrangement with defendant after his death, all support the plausibility and likelihood that plaintiff wanted to hold the property this way and took this action of her own volition. Moreover, any inference of defendant's overreaching is further dispelled by the uncontroverted fact that she at no time withdrew any money on her own behalf from the joint accounts to which she had complete access for over six months, and promptly turned over the account books to plaintiff and her original attorney and relinquished any claim on them.

Thus, even if the relationship between plaintiff and defendant were deemed to be fiduciary—and the facts do not necessarily support that assumption—since the conveyance was not procured through improper means or attended by overreaching, but was executed by the plaintiff grantor after full disclosure had been made of its nature and as a result of her own volition, there are no grounds for invalidating the transaction. *Matanic v. Krajach,* 392 Ill. 547.

In the *Matanic case* the court stated at p. 551: "* * * it is equally well established that the existence of a fiduciary relation does not invalidate a transaction where the evidence discloses that the conveyance was not procured through improper means attended with circumstances of oppression or overreaching, but was entered into by the grantor with full knowledge of its nature and effect and because of his or her deliberate, voluntary and intelligent desire. These principles have been so often enunciated by this and other courts and are so well and universally understood that the citation of authority is unnecessary."

We must agree with the master that insight into the basis of this entire litigation is gained when we note that there was no dissatisfaction with the joint tenancy or joint accounts until plaintiff's sister moved in with the Vaicaitis family, and that plaintiff admitted that she wanted to do as her sister had done. In this connection we cannot overlook the evidence that plaintiff's sister paid Anthony Vaicaitis her life savings of $18,000 toward the purchase price of his $25,000 home on the supposition that she was a joint tenant, but that he alone held title to the premises, and had merely signed an agreement to take care of her during her lifetime. These circumstances further support the master's finding that plaintiff merely changed her mind about her property disposition after she came under the influence of the Vaicaitis family, and that if there were misrepresentations made to plaintiff, or undue influence exercised, it was not by defendants.

It is therefore our opinion that the evidence overwhelmingly supports the findings of the master, and that the summary conclusion of the chancellor that plaintiff established the allegations of her complaint is contrary to the evidence. Consequently, the decree entered thereon, requiring defendants to convey the property to plaintiff, must be reversed. We find that the fee-simple interest to the real estate in controversy is properly held by plaintiff and defendants in joint tenancy, and plaintiff's complaint is dismissed with costs assessed to her.

*Decree reversed.*