(No. 36806.—

WANDA BORYCA, Appellant, *vs.* GENEVIEVE H. PARRY, Appellee.

*Opinion filed March 23, 1962.*

STANLEY WERDELL and ANTON A. SMIGIEL, both of Chicago, for appellant.

JOHN N. BATRYN and WILLIAM B. SMITH, both of Chicago, for appellee.

Mr. JUSTICE DAILY delivered the opinion of the court:

Alleging fraud, undue influence, breach of a fiduciary relation and want of consideration, the plaintiff, Wanda Boryca, suing as both an individual and as the executrix of her mother's will, started this action in the circuit court of Cook County against her sister, Genevieve H. Parry, and the registrar of titles, to set aside a trust deed and trust agreement pertaining to property once owned by their mother. After hearing extensive evidence, a master concluded there was no fraud or undue influence, but that the transfer of the property by the mother to defendant was a voluntary act occurring after she had received independent advice from an attorney, and recommended that plaintiff's complaint be dismissed for want of equity. This direct appeal, involving a freehold, is prosecuted by plaintiff from a decree conforming to the master's recommendation.

The principal parties to this appeal are the only children of John and Sophie Panto. The property in question, located at 5408 W. Schubert Avenue in Chicago, was purchased by the parents as joint tenants in 1928, at which time it was improved with a single-story, frame residence building and occupied by relatives as tenants. Panto died intestate in 1931, when plaintiff and defendant were 6 and 5

years of age, respectively, and Sophie Panto became the sole owner. She and the children moved into the building which was later remodeled so as to have a three-room apartment in the basement and a five-room apartment on the main floor. Its value at the time of the execution of the trust instruments involved was stipulated at $18,000.

Sophie Panto had no formal education and could not read or write English, although she spoke it brokenly; she spoke the Polish language but could not read or write it. For many years she worked as a janitress in office buildings in the city of Chicago. In 1952 she suffered a heart attack, but resumed work and was employed until February, 1957, when she suffered a second heart attack. After that date, and until her death on November 26, 1957, she did not work, but was not bedridden and was able to do housework, go to the doctor, do shopping and travel alone about the city. At her death she was 71 years of age.

Following the death of the father, plaintiff continued with her education through the first year of high school when, at age 16, she quit school and went to work in a factory to help out with household expenses. Defendant attended high school for four years and graduated in 1945. She had part-time employment during the last three school years, full-time employment in the summer and, after graduation, was regularly employed as a telephone operator. During this period both girls lived with their mother in the basement apartment and the upstairs apartment was rented.

In 1945, plaintiff married Frank Boryca, a next-door neighbor, and took up her residence with him in a property he was purchasing at 5410 W. Schubert Avenue. Five years later, in 1950, defendant married Robert W. Parry and lived with her husband in the first floor apartment of her mother's property paying a rental of $35 a month. The mother continued to live in the basement apartment. This was the status of the parties in June, 1952, when Sophie Panto executed a last will and testament wherein she

nominated plaintiff as executrix and directed that her estate be distributed equally between her daughters. The will was prepared for her by an attorney who was the secretary of the Alliance Savings & Loan Association near her home. It was never revoked.

Defendant became estranged from her husband and they were separated in June, 1954. Thereafter, and until the date of her mother's death, defendant continued to reside in the first floor apartment, paying rent of $35 a month, and the mother resided in the basement. The next pertinent event after the execution of the will occurred when plaintiff filed suit for divorce in September, 1956. This proceeding culminated with a decree entered May 13, 1957, which awarded plaintiff custody of two minor children and provided that Frank Boryca was to convey to plaintiff his interest in the real estate at 5410 W. Schubert Avenue, the plaintiff to pay him one-half the value of such real estate, or $8000, and plaintiff "to apply immediately for a mortgage to effectuate settlement and if additional security is required, plaintiff, with her mother's consent, shall use adjoining property owned by her mother for such purpose." Whether the mother was ever approached with the proposition of mortgaging her property for plaintiff's benefit, either before or after the divorce decree, does not appear in the record.

On March 8, 1957, Joseph P. Sokal, an attorney who kept evening office hours, (after 4:00 P.M.,) at the savings and loan association where Sophie's will had been drawn, was told that a woman had been inquiring for him earlier. Whether this woman was Sophie Panto or the defendant does not clearly appear, but proof in the record does establish that defendant was at work from 8:00 A.M. to 4:30 P.M. on that day. In any event, Sophie and defendant came to Sokal's office sometime between 5:00 and 8:00 P.M. and the matter of Sophie's property was discussed. Sokal, an attorney of 24 years experience, testified that he spoke

Polish "in a crippled way," but understood it better than he spoke it. According to Sokal, the mother said she was a widow, then explained defendant's marital difficulty and stated that inasmuch as defendant's religion would not permit her to remarry she, Sophie, wanted it arranged so defendant would have a home and so that defendant's husband would have no interest in the property at Sophie's death. The discussion next turned to the question of how plaintiff would be provided for and it was ultimately agreed that she should be paid $4000. Sokal said defendant was reluctant to obligate herself for that amount because she did not have the money or know when she would have the ability to pay it.

Sokal then outlined and advised the course to follow, which was agreed to by Sophie, and at her request drew up the following instruments, the first two of which were then executed: (1) A trust deed conveying the property at 5408 W. Schubert to defendant as trustee; (2) a trust agreement between Sophie and defendant whereby Sophie was to retain a life estate and the title was to pass to defendant at Sophie's death; (3) a promissory note of defendant to plaintiff in the amount of $4,000, payable in five years with no interest; (4) a "Declaration" wherein plaintiff acknowledged receipt of the promissory note and which also stated: "It is expressly understood that this note was executed and delivered by the maker at the request of our mother * * * as part of the distribution to her children of her property which consists of the real estate known as 5408 W. Schubert Ave."

Late in the month of May, 1957, plaintiff and defendant met in the kitchen of defendant's apartment. Defendant testified that Sophie Panto was also present, but plaintiff disputes this. According to defendant, she spread out on a table all of the documents drawn up by Attorney Sokal, together with the new Torrens certificate of title, and explained to plaintiff the arrangements their mother had made.

Plaintiff's version was that she was shown only the note and "declaration," was given inconclusive answers as to the purpose of the papers, was not informed or aware that title had been transferred from the mother and that she did not learn of the conveyance until after her mother's death. In any event, it was agreed that defendant signed the $4000 promissory note and delivered it to plaintiff, and that the latter also signed the "declaration." On this same occasion, according to defendant, she agreed to pay plaintiff $2000 on the note, while their mother promised to give her $1000, to help plaintiff in her divorce proceeding.

On May 25, 1957, plaintiff was given a check for $1000 payable to Frank Boryca, drawn upon a joint account the mother and defendant had in a savings and loan association. This account was closed the same day. Plaintiff denied that this was a gift, and said it was a loan from her mother. Thereafter, defendant withdrew $2000 in savings she had in an employees' fund at the telephone company and this amount was paid to plaintiff on June 14, 1957, at the office of an attorney employed by defendant. At that time, plaintiff endorsed the payment on the back of the $4000 note and signed a receipt dictated by the attorney which said in part: "This payment and promissory note arose out of a declaration signed by Genevieve H. Parry and Wanda Boryca dated March 7, 1957, and related to a distribution of real estate previously owned by Mrs. Sophie Panto, mother" of the parties to the declaration. With these amounts paid to her, plus $5000 raised by a mortgage on the Boryca property, plaintiff was able to effectuate the property settlement with Frank Boryca that had been outlined in her divorce decree. During the pendency of the present proceeding plaintiff purportedly repaid the $1000 she had received from her mother by depositing it in her account as executrix of the mother's will. As to the $2000, it was stipulated that defendant was unwilling to accept its tender from plaintiff, with or without interest.

On August 23, 1957, defendant and her mother opened a joint savings account at the Alliance Savings and Loan Association, which was maintained until November 26, 1957, the date of Sophie Panto's death. Defendant conceded that she was a joint tenant for convenience. Shortly after the mother's funeral, which had been arranged for by both sisters, insurance proceeds and the proceeds from the savings account at Alliance were used to pay various expenses, to reimburse defendant for certain advances and the balance was divided equally, although plaintiff now claims her share was short by $72.37. The sisters became estranged by a quarrel which started over a detail of their mother's funeral, and in June, 1959, the plaintiff initiated this proceeding.

It is conceded that a fiduciary relationship existed between defendant and her mother, with the former being the dominant party, thus bringing into operation familiar and well-settled principles. Where such a relationship exists, the law presumes as fraudulent any transaction between the parties wherein the dominant party has profited, and the latter must rebut the presumption of fraud by clear and convincing proof that he has exercised good faith and has not betrayed the trust and confidence reposed in him. If such burden of proof is not discharged by the dominant party, the transaction will be set aside in equity. (*Hofert* v. *Latorri,* 22 Ill.2d 126; *McFail* v. *Braden,* 19 Ill.2d 108.) On the other hand, "if a conveyance was not procured through improper means attended with circumstances of oppression or overreaching, but was entered into by the grantor with full knowledge of its nature and effect and because of his or her deliberate, voluntary and intelligent desire, the existence of a fiduciary relation does not invalidate the transaction." (*Clark* v. *Clark,* 398 Ill. 592, 602; see also: *Matanic* v. *Krajach,* 392 Ill. 547; *Uksas* v. *Zelensky,* 21 Ill.2d 303.) Transactions between parties to a fiduciary relation, if open, fair and deliberately made, are

as valid as transactions between other parties. *Schueler* v. *Blomstrand,* 394 Ill. 600; *Winkelman* v. *Winkelman,* 307 Ill. 249.

We are in accord with the master and chancellor that the evidence here precludes any finding that defendant was the aggressor in the transaction, or that the mother's actions were prompted or induced by misrepresentation, overreaching or fraud on defendant's part. Instead, it appears that the deed and trust agreement under attack were executed as a result of the mother's own volition after a full disclosure of their nature and upon competent and independent legal advice. Arguing to the contrary, in support of a contention that the findings of the master and chancellor are against the manifest weight of the evidence, plaintiff insists that Sokal was defendant's attorney and acted only to protect her interests, thus leaving Sophie Panto without competent or independent advice. (See: *Dombrow* v. *Dombrow,* 401 Ill. 324, 333; *Works* v. *McNeil,* 1 Ill.2d 47, 52.) We find these assertions to be in direct contradiction to what appears in the record. Sokal had never seen either woman before and it was his uncontradicted testimony that Sophie Panto was his client, that it was she who sought advice and whom he advised, and that he had prepared the documents at her request. The mere presence of defendant in Sokal's office while this conversation was going on did not constitute undue influence or transform Sokal into defendant's attorney, (cf. *Lake* v. *Seiffert,* 410 Ill. 444; *Tidholm* v. *Tidholm,* 391 Ill. 19,) and there is no showing that she influenced either her mother or Sokal by word or deed. Indeed, it was Sokal's testimony that she was not fully in accord with the course chosen by her mother because she was reluctant to obligate herself to pay $4000 to her sister in view of the uncertainty as to when she would be able to pay it. In short, what the record shows with regard to the trust instruments is succinctly encompassed in the testimony of

Sokal when he said: "Mrs. Panto told me what she wanted to achieve and I decided that was the course to pursue."

Asserting that Sophie Panto was old and ill, and pointing to her limited knowledge of English as well as Sokal's limited knowledge of the Polish language, plaintiff next contends there is no satisfactory proof that Sophie knew and understood the nature of the transaction and its consequences. Again, we do not find this contention well taken. Sokal, who testified in detail as to the events in his office, stated that he had explained the effect of the trust arrangement to the mother and expressed the opinion that she had sufficient mental capacity to understand the documents he prepared for her. Although she suffered from a heart condition, there is uncontradicted evidence that Sophie Panto was able to be up and about and that but a few days before this transaction she had gone to an office to apply for unemployment compensation benefits. Nowhere in the record does it appear that she suffered from either mental or physical impediment which would affect her ability to know and comprehend the nature and effect of the documents she executed. Nor was the language situation an insuperable barrier to her understanding. Sophie Panto could speak broken English, and it is not to be overlooked that she had been employed for years and had transacted business and raised her children in an environment where the English language was spoken. (Cf. *Uksas* v. *Zelensky,* 21 Ill.2d 303.) Sokal, while saying he spoke the Polish language in a "crippled way," explained he meant he could not speak it in the academically accurate way he had been taught in school. Under all of the circumstances, particularly in light of Sokal's testimony that he and Sophie Panto had experienced no difficulty in communicating with each other, it appears that a full disclosure of the nature and effect of the instruments was made to her and that she fully understood them.

Plaintiffs further contentions that there was no consideration for the deed and that defendant withheld relevant information from her mother are equally untenable. Natural love and affection are sufficient consideration for a deed to the children of the grantor, and a voluntary deed of conveyance to the child or children of the grantor requires no valuable consideration to render it effective and binding on the grantor. (*Brown* v. *Moore,* 407 Ill. 618; *Steinke* v. *Sztanka,* 364 Ill. 334.) If more is needed, defendant's assumption of the obligation to pay $4000 to her sister, the grantor's other daughter, was a valuable consideration for the deed. As to the second contention, even if it could be said with certainty the mother was not aware that defendant had some savings in a credit union or that she was buying stock in her employer's company, such factors would not be relevant to Sophie Panto's avowed purpose of providing defendant with a home in the future.

Predicated upon her own testimony that she was never informed of the conveyance or told the purpose of the transaction, plaintiff next urges that defendant was guilty of fraud and deception on the occasions when plaintiff signed the "declaration" prepared by Sokal, when she accepted the $4000 promissory note, and when she signed a receipt for the payment of $2000 on the note. We would add, too, that these circumstances are likewise advanced as proof that defendant was guilty of overreaching from the very beginning of the entire transaction. Significantly, in resolving this issue against the plaintiff, the master noted one of the principal considerations as being: "* * * watching the plaintiff testify." Our examination of the record reveals that the question of whether defendant did or did not inform plaintiff of the conveyance at the time the declaration was signed and the note delivered, depends to a great degree upon a determination of which party was telling the truth as to what occurred in the defendant's kitchen, and on the subsequent occasion when plaintiff was paid $2000 in the

office of defendant's attorney. The master evidently accepted the defendant's version as true. And while it is the rule, in a situation such as this, that the master's findings on controverted facts do not carry the same weight as a jury's verdict, they are nonetheless advisory and entitled to much consideration. (*Uksas* v. *Zelensky*, 21 Ill.2d 303, 311-312.) Apart from the extent to which the issue depends upon the plaintiff's credibility, and despite her persistent denial that she knew of the conveyance to her sister, we think it apparent from her entire testimony that she did know of the conveyance and likewise knew that the $4000 note was given her in lieu of any interest in her mother's real property. Indeed, she admitted upon two occasions she knew that her sister had acquired "some interest" in the mother's property before the latter's death. Moreover, in considering the question of plaintiff's knowledge, we think it significant that the family settlement effected by Sophie Panto occurred at a time when plaintiff was saddled with the difficult burden of raising $8000 in order to resolve the divorce proceeding with her husband.

In a further effort to vitiate the transaction plaintiff next contends the deed was void for want of delivery, her theory being there is no proof Sophie Panto intended that the deed vest an estate in the defendant at once. As previously noted, however, the testimony of attorney Sokal and the fact that the mother reserved to herself a life estate, permits no doubt that the latter intended for the deed to be effective at once. Moreover, the recording of a deed constitutes *prima facie* evidence of its delivery, and the execution and recording of a deed by a grantor is held to show *prima facie* an intention on his part that such a deed should become legally operative. (*Maciaszek* v. *Maciaszek*, 21 Ill. 2d 542, 546.) Here, the record shows that Sokal filed the deed with the registrar of titles at the grantor's request and obtained a new certificate of title, and there is a complete absence of any proof on the part of plaintiff to show that

such recording was for any purpose other than to presently vest the title in defendant.

Plaintiff attacks the decree and the findings of the master by asserting (1) that specific performance of the "declaration" should have been decreed as alternative relief, and (2) that the master failed to pass on the issue of unjust enrichment. Neither contention has substance or merit. The latter is founded upon an allegation of the complaint that defendant's alleged fraud and misrepresentations were "designed at unjust enrichment," and we think it reasonable to say that its resolution was sufficiently encompassed in the finding of the master that defendant had not been guilty of fraud or misrepresentation. In urging that she is entitled to specific performance of the "declaration," plaintiff does not contend that defendant should presently be compelled to pay her the balance on the $4000 note mentioned therein, but asks that the "declaration" be construed as a contract between the sisters to share equally in their mother's real property. Only by torturing the plain meaning of the language of the "declaration," and by violating all established rules relating to the construction of contracts, could the declaration be construed as a contract to divide the property and the relief of specific performance granted.

The master sustained several objections by defendant to questions which sought to elicit plaintiff's state of mind and understanding at the time she signed the "declaration," and these rulings are also assigned as error. While the authorities cited by plaintiff do little to sustain her position, we do not find that the issue of the admissibility of such testimony is properly before us on appeal, inasmuch as it was neither raised nor passed upon in either the objections or exceptions to the master's report. See: *Peck v. Peck,* 16 Ill.2d 268, 278; *Dunlavy v. Lowrie,* 372 Ill. 622; Cleary, Handbook of Illinois Evidence, sec. 1.16.

Contention is next made that it was error for the chancellor to tax the master's fees and charges against plaintiff

over her objections that they were excessive and not properly itemized as required by law. However, we do not find that the chancellor abused his discretion in such respect. Itemization is not required to the minute degree contended for by plaintiff, nor do we consider fees and charges totalling $1737.35 excessive in view of the number of folios of evidence reported, the time devoted by the master to the reference and the complications of fact and law involved in preparing the report of his findings and conclusions.

Section 60 of the Probate Act provides that any person who has the testator's will in his possession shall, immediately upon the death of the testator, deliver such will to the proper probate clerk. Thereafter, the section provides: "Any person withholding a will for more than thirty days after the death of the testator shall forfeit and pay twenty dollars per month from the time it is wrongfully withheld to be recovered by a civil action for the use of the estate by any person who sues therefor in any court having jurisdiction thereof." (Ill. Rev. Stat. 1959, chap. 3, par. 212.) Plaintiff, who sued both as an individual and as executrix of her mother's will, set forth the foregoing section of the statute verbatim in her complaint, alleged that defendant had withheld their mother's will for approximately twenty-five months and prayed for a money decree for such sum as the evidence disclosed. Issue was joined when defendant's answer denied such allegations and her liability under the statute. The proof with respect to such issue was that defendant had found the will two days after her mother's death in a box where the latter kept valuable papers, that she read it and then replaced it in the box. When this litigation started, some two years later, defendant gave the will to her attorney who passed it on to plaintiff's attorney. Thereafter, it was filed with the probate clerk, was admitted to probate and letters testamentary were issued to plaintiff.

Neither the master nor the chancellor made any findings or determination with respect to this issue even though it

was again specifically raised in the objections and exceptions filed by plaintiff to the master's report. Because of this omission it is contended that the decree must be reversed and the cause remanded. It does not follow, however, that because no findings were made either by the court or the master with respect to such issue that we must reverse the decree and remand the cause. The controverted question is a narrow one, *viz.*, whether defendant wrongfully withheld the will, and there is no dispute as to the facts thus presenting a question of law.

Even if it be assumed defendant had the "possession" of the will contemplated by the legislature, (see: 95 C.J.S., Wills, sec. 311c, p.p. 116-117,) we cannot say under the circumstances in the record that there was a "wrongful" withholding such as would subject defendant to the penalty under the statute. (Cf. *Rodisch* v. *Koethe,* 178 Ill. App. 286.) While not conclusive, both sisters knew of the existence of the will and this is not a case where defendant would accomplish personal gain nor, in light of the family settlement five years after the will was executed, would she defeat the testator's intent by failing to file the will. Considering that the testator had conveyed her real property prior to her death, the only asset of consequence in her estate was $305.21 in a savings and loan association. Medical and funeral expenses totalled $1,339.95 and thus the estate was insolvent for all practical purposes. We think it significant also that the two sisters made up the deficiency in medical and funeral expenses from the proceeds of insurance policies and divided what was left between them, and that no claim of a wrongful withholding of the will was made until this litigation commenced.

For the reasons stated, the decree of the circuit court of Cook County is affirmed in all respects.

*Decree affirmed.*