In the Matter of the Estate of Florine E.
Wright, Deceased.
Lewis B. Wright and Edwin Wright, Petitioners for
Citation, Appellees, v. Grace J. Blake, Respondent
in Citation, Appellant.

Gen. No. 49,226.

First District, Third Division.

May 7, 1964.

Rehearing denied June 1, 1964.

George T. Spensley, of Chicago, for appellant.

Nicholson, Nisen & Elliott, of Chicago (Charles M. Nisen and Kai A. Nebel, of counsel), for appellees.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

This is an appeal from an order entered by the Probate Court of Cook County in a citation proceeding brought by Lewis B. Wright and Edwin Wright to compel respondent, Grace J. Blake, to turn over to the executor of the estate of Florine E. Wright the proceeds from the sale of property at 1322 Felicity Street, New Orleans, Louisiana, which allegedly belong to said estate and which are presently in the possession and control of respondent. The order appealed from entered judgment in favor of the executor and against the respondent for $26,000, the amount received by respondent pursuant to a document entitled "Act of Donation" executed by the decedent, and for costs in the citation proceeding.

The petitioners are nephews by affinity of the deceased, Florine Wright. Neither the petitioners nor the respondent are blood relatives of the deceased, Florine Wright.

The pertinent facts brought out on trial are as follows:

Decedent, Florine Wright, was married to one Gustin Wright. They resided at the above mentioned Felicity Street address in New Orleans for the ten years immediately preceding Gustin's death on November 5, 1956. Grace Blake visited them in New Orleans about eight times, each visit being of some duration. She was preparing Gustin's memoirs and carrying on correspondence for him. When Gustin died Grace Blake flew to New Orleans to be with Florine Wright. When she arrived Ben Eastwood, a friend of the Wrights, was making the burial arrangements, and she phoned Edwin Wright so that he might make some changes in said arrangements in order to more nearly coincide with the wishes of the deceased.

Grace Blake, in an attempt to aid in the settling of Gustin's estate tried unsuccessfully to reach one Cabrall, the attorney who had drawn Gustin's will. On advice of friends she contacted one Dudley Phillips, an attorney, who procured the will from Mr. Cabrall. The will left the entire estate to Florine. With the aid of attorney Phillips, the estate was settled by putting Florine in simple possession, a probate device used in Louisiana to avoid the expense of administration.

Arrangements were made for Florine to stay with friends in New Orleans. During this period following Gustin's death attorney Phillips saw Florine on an average of once a week and advised her concerning matters such as how to handle her property and keep records of her income and disbursements. He also discussed the drawing of a will for her. Petitioner, Edwin Wright, a nephew of the deceased Gustin Wright, flew down to New Orleans to look over the situation personally. He arrived one day and left the next. While he was there, Florine presented him with a ring that had been given to her husband by the Queen of Roumania. Subsequent to Edwin's visit, attorney

Phillips drew up a will for Florine leaving the bulk of her estate to Edwin and his brother Lewis Wright, the petitioners herein. As Florine was not versed in business matters, Mr. Phillips was given a general power of attorney to handle her affairs.

Arrangements were made for Florine to visit petitioners and their mother, Constance Wright, in Saginaw, Michigan. Florine and Grace Blake left New Orleans in mid-December, 1956, and proceeded to Grace Blake's daughter's home in Chicago. Constance Wright, the mother of the petitioners, drove into Chicago from Saginaw and picked up Florine to take her back home for a visit.

In April of 1957 Edwin Wright wrote to Grace Blake and told her that Florine had decided to stay with Constance Wright in Saginaw, Michigan. He was upset with the way attorney Phillips had been handling Florine's affairs, and, although he stated that he thought Mr. Phillips was trustworthy, he took Florine to an attorney at the Detroit Bank (allegedly at Florine's insistence) and had him revoke attorney Phillips' general power of attorney and make out a limited power that would give Mr. Phillips authority to handle her property located in New Orleans. In this letter he suggested that the Felicity Street property be sold, saying, "Florine was talking of selling her house long before these other matters came up so I am sure she would be agreeable to this." While she was staying in Michigan, Florine was also taken to see another lawyer, a Mr. Sherrard, whom she consulted regarding the drafting of a new will.

On May 1, 1957 Grace Blake arrived unannounced at the home of Constance Wright in Saginaw. Constance stated that she and Florine were engaged in a search for some jewelry which Florine had mislaid. Grace took Florine to lunch and at about 1:00 p. m. she phoned Constance from the restaurant and stated,

199

"I am going to take Florine to Chicago." She did this without stopping to pick up any of Florine's things, and the next day Constance and Edwin Wright arrived at the Chicago residence of Grace Blake's daughter, but were refused admission. Apparently Florine thought that Constance Wright had stolen her jewelry, because while Constance and Edwin Wright were trying to gain admission Florine said, "They are thaves (French pronunciation). They took my jewels." A short time later, Constance Wright found Florine's jewelry in a dresser drawer in Constance's home in Saginaw. She then consulted Joseph Sherrard, the attorney Florine had seen regarding the drafting of a new will, and on his advice, she placed the jewelry in a safety deposit box, and after Florine died, she sent the jewelry to Florine's executor.

On the second or third of May, Grace Blake and Florine Wright left by train for New Orleans. On Monday, May 6, 1957, Florine saw attorney Phillips and had him draw a "revocation" revoking any "procurations" of power of attorney she may have given while in Michigan. Thereafter, on July 1, 1957, Florine gave Grace Blake a general power of attorney to convey real estate, and on July 24 gave her a power to sign checks on her account. On October 11, 1957 the sale of the Felicity Street property was consummated, and the proceeds of the sale were deposited in Florine Wright's account. On the same day an instrument entitled "Act of Donation" was executed by Florine at the office of attorney Phillips in New Orleans, Louisiana. Said "Act of Donation" reads as follows:

"ACT OF DONATION

By: Mrs. Florine G. Wright
To: Mrs. Grace Blake
United States of America
State of Louisiana
Parish of Orleans

200

Be It Known, That on this 11th day of October, in the year of our Lord, One Thousand Nine Hundred and Fifty-seven, and of the Independence of the United States of America, the one hundred eighty-second.

Before Me, the undersigned authority, personally came and appeared:

Mrs. Florine Godefrey, widow of William Gustin Wright, of the full age of majority and a resident of the Parish of Orleans, declared unto me, Notary, that she has been married but once and then to the said William Gustin Wright who died and that she has not since remarried, who declared unto me, Notary, that she has granted, given, and does by these presents, grant, give and donate inter vivos at present and irrevocably unto Mrs. Grace Blake, of the full age of majority and a resident of the Parish of Orleans, hereby appearing for the purpose of accepting the within donation, the following described property, to-wit:

The sum of Twenty-Seven Thousand and No/100 ($27,000.00) Dollars, cash.

The within donation is made for and in consideration of the love and affection for the said Mrs. Grace Blake, who is a cousin of her late husband, and for and in consideration of the services of the said Mrs. Grace Blake performed for her late husband during the last years of his life and for and in consideration for the services, companionship and guidance which the said Mrs. Grace Blake has rendered to donor since the death of her said husband.

Said donor further declared that she hereby authorizes and directs the said donee, upon their return to Chicago, Illinois, to draw against donor's account in the National Bank of Commerce in New Orleans, where said funds are located, transferring said amount to a bank of donee's choosing

in Chicago, Illinois, for her use and benefit. It is the intention of donor herein, that the within donation be completed however, upon execution of this act of donation as fully as if the funds were now being transferred in cash to donee. Inasmuch as it is the intention of the parties to leave for Chicago, Illinois, within a short period after date hereof, said funds are left on deposit as aforesaid for safekeeping.

As a further consideration of the donation herein, donee does hereby bind and obligate herself to care for and support donor for the remaining years of her life, should donor desire to reside with donee. In the event donor does not so desire to remain with donee, such fact will not in any manner, affect the within donation, for donor has sufficient funds located in trust with the Detroit Bank and Trust Company of Detroit, Michigan.

Thus Done and Signed on the day and date first hereinabove written in the presence of Theresa Shean and Janice Noel, competent witnesses, who hereunto sign their names with me, Notary, after due reading of the whole.

 /s/ Mrs. Florence G. Wright
 /s/ Mrs. Grace Blake
Witnesses:
/s/ Theresa Shean
/s/ Janice Noel
 /s/ Dudley A. Philips, Jr. Notary Public"

Grace Blake and Florine Wright left for Chicago shortly after October 11, 1957 and on October 17, 1957, in accordance with the authority granted by the "Act of Donation" $26,000 was transferred from Florine's account in the National Bank of Commerce of New Orleans to Grace Blake's account in a Chicago bank.

The additional $1,000 authorized by the "Act of Donation" was apparently never transferred.

Mrs. Wright stayed in Chicago with Mrs. Blake until January 20, 1960, at which time she was sent to a nursing home because of ill health and died eight days later. During her stay in Chicago Florine was cared for by Mrs. Blake, who supplied her with lodging, food and companionship. While in Chicago Florine had consulted Julia Hagerty, a Chicago lawyer, concerning certain tax matters and the drafting of her will.

Petitioners contend that respondent failed to sustain the burden of showing by clear and convincing proof that the act of donation was not the result of overreaching on her part.

■■ Respondent admits that a fiduciary relationship existed and petitioners are correct when they state the law to be that where a fiduciary relationship exists, any transaction between the parties by which the dominant party benefits is presumed to be fraudulent. The dominant party can rebut this presumption, but he must present clear and convincing proof that there was no overreaching on his part. In Clark v. Clark, 398 Ill 592, the court said at page 601, 76 NE2d 446:

> "When the existence of a fiduciary relation has been established the law presumes that any transaction between the parties, by which the dominant party had profited, is fraudulent. This presumption is not conclusive, but may be rebutted by clear and convincing proof that the dominant party has exercised good faith and has not betrayed the confidence reposed in him. The burden rests upon the dominant party to produce such evidence, and if the burden is not discharged the transaction will be set aside in equity. (McCord v. Roberts, 334 Ill 233) . . . . The question in all

such cases is whether the dominant party who has obtained the benefit of the transaction has exercised good faith and not betrayed the confidence reposed in him. If so, the existence of a fiduciary relation will not invalidate the conveyance. . . ."

The record is replete with evidence of respondent's good faith and loyalty to the decedent. Prior to decedent's husband's demise, respondent visited with them frequently, even though they lived at some distance from respondent's home. A partial purpose, at least, of these visits was to be of service to decedent's husband in the conduct of his personal and business affairs. Petitioner Edwin Wright, incidentally, only managed to make the trip to New Orleans once during the ten years that Gustin and Florine resided there.

When Gustin Wright died respondent proceeded to New Orleans where she helped to see to it that the necessary arrangements were made to insure that his wishes regarding interment were executed. She stayed with Florine and expended considerable time and effort aiding her in settling Gustin's estate, even though everything was left to Florine outright and respondent benefited in no way.

As is indicated by her letters to the Wrights, she was worried that Florine might be bilked by some of her New Orleans "friends," so she stayed with her to insure that no advantage would be taken of her. This interest in protecting Florine is evidenced in Grace Blake's letter to Edwin Wright dated November 7, 1956, where she said, "I will not leave until things are properly administered, because between the 'colored girl' and 'Ben' Flo would be left wanting," and again in her letter of November 23, 1956, where she said, "I will not leave until things are straightened

204

out. Florine could not be left alone here. Mr. Phillips begged me to stay, as Florine doesn't know anything. You know, Gustin was like a General and gave all the orders and took complete charge of their affairs." Petitioners refer to these and other passages from letters in which Grace Blake expressed concern over the ability of Florine to take care of her affairs, and which allude to her as being somewhat feeble and incompetent. These passages, they contend, indicate that Florine was especially susceptible to the influence of others, and from this they infer that she was the victim of overreaching on the part of the respondent. They carefully avoid any charge that decedent was incompetent as this might tend to invalidate the will under which they are beneficiaries. It is not clear how their argument could not equally apply to the gift of the ring to Edwin. He did not appear to be too worried about overreaching when he accepted it.

Certainly an elderly lady who had led a sheltered life, having all of her affairs conducted by her husband, would be susceptible to undue influence, but the record is devoid of any such influence being exercised. The testimony of Julia Hagerty, a Chicago attorney employed by Florine Wright, tends to rebut any presumption of undue influence. Julia Hagerty testified as follows concerning a conversation had at the time of the drafting of Florine's will: "Mrs. Wright wanted to leave everything to Mrs. Blake, and Mrs. Blake objected and said that Mrs. Wright had already given her enough. Mrs. Wright then wanted to leave her worldly possessions to the grandsons of Mrs. Blake with whom she was living at this time. Mrs. Blake objected to this, and as I recall it, said something about, 'Gustin would want you to leave it to the boys in Michigan' and have certain bequests to friends who had befriended her.

205

"Mrs. Wright then decided to leave the entire residuary to these nephews of her husband who lived in Michigan." She then identified said nephews as the petitioners.

There certainly was not any overreaching here. Mrs. Blake refused to benefit by the will. It is unreasonable to assume that she would exercise undue influence to obtain a gift from the decedent, and then refuse a benefit freely offered by the same person.

Petitioners argue that it was improper for Mrs. Blake to allow decedent to think that the jewelry, which was misplaced during decedent's stay in Michigan, had been stolen. They do not say how she could have dispossessed her of this idea. Constance Wright never informed either decedent or Mrs. Blake that she had the jewelry in her possession. When Constance discovered it she went immediately to a Detroit attorney, who advised her to place the jewelry in a safety deposit box. This she did and the jewelry did not again show up until it was sent to decedent's executor. The court will not speculate as to what might have happened to the jewelry had the petitioners not been the residuary legatees under decedent's will.

The evidence in this case shows that respondent kept petitioners fully informed of matters concerning Florine's affairs until the time of her visits with petitioners' mother. Respondent removed Florine Wright from the home of Constance Wright, thus ending the visit, because, as she testified, she thought that Edwin Wright, one of the petitioners, was going to place Florine in an old peoples home. Apparently there were hard feelings on both sides after the visit, and this made further communication impractical. Despite these hard feelings, Grace cared for petitioners' interests when Florine's will was being drafted, and did this even though by so doing she lost a chance to bene-

206

fit personally from decedent's estate. Such selfless action is hardly consistent with the charge of undue influence.

Respondent alleges that the evidence shows that the "Act of Donation" was executed as the result of decedent's own volition, and upon competent and independent legal advice. Petitioners argue that the element of independent legal advice was not present here, and that attorney Phillips acted as a mere scrivener in the drafting of the "Act of Donation." The deposition of attorney Phillips shows something more than a role as scrivener. His testimony showed that he had helped the decedent settle her husband's estate. That during the time she was in New Orleans he contacted her about once a week and helped her handle her finances. For a period of time he handled all of her affairs under a power of attorney which she had given to him. He was thoroughly conversant with her situation. He advised her on the choice of real estate agents for the sale of the house, and he advised her on the execution of a power of attorney in favor of Grace Blake. It is illogical to assume that he changed his role from legal adviser to one of scrivener when the matter of making a gift of the proceeds from the sale of the house was broached. The evidence belies any such change in roles. Mrs. Florine Wright discussed with him in detail her decision to make the gift and the reasons behind it. One does not normally discuss such matters with a mere scrivener.

■ The existence of independent legal advice is an important element in refuting a charge of undue influence. Clark v. Clark, 398 Ill 592, 76 NE2d 446; Uksas v. Zelensky, 21 Ill2d 303, 172 NE2d 359; Boryca v. Parry, 24 Ill2d 320, 181 NE2d 124. That such independent legal advice was given is established by the record.

207

■ As has been shown, the respondent consistently acted in good faith and showed her loyalty to the decedent. Her role was one of a selfless helpmate whose only thought was for the protection and well being of the decedent. Grace Blake took care of Florine Wright for the twenty-seven months just prior to Florine's death, and by so doing did in fact perform the "consideration" recited in the "Act of Donation." The transaction is devoid of any evidence of overreaching, and was, in fact, executed with the aid of independent legal advice. Respondent has by clear and convincing evidence rebutted the presumption of overreaching which arose from the fiduciary relationship existing between her and the decedent. Under these circumstances we hold that the transfer of funds to the respondent under the authority of the "Act of Donation" constituted a valid gift and that Grace Blake became the absolute owner thereof at the time of the transfer.

For the foregoing reasons the order and judgment of the Probate Court is reversed and the cause remanded with directions to dismiss the petition of Edwin Wright and Lewis B. Wright.

Order and judgment reversed and cause remanded with directions.

. SCHWARTZ, P. J. and DEMPSEY, J., concur.