561 N.E.2d 1212 (1990)
203 Ill. App.3d 1080
149 Ill.Dec. 516
In the Matter of the ESTATE OF Fred H. WESSELS, Deceased.
Wesley J. Wessels, Objector-Appellant,
v.
Winifred R. Burrow, Claimant-Appellee.
No. 3-89-0747.
Appellate Court of Illinois, Third District.
September 27, 1990.
Frank J. Simutis (argued), Ackman, Marek, Boyd & Simutis, Ltd., Watseka, for Wesley Wessels.
Ralph J. Swanson (argued), Sebat, Swanson, Banks, Garman & Townsley, Danville, for Winifred Burrow.
*1213 Justice GORMAN delivered the opinion of the court:
An objector, Wesley J. Wessels, appeals from the circuit court's allowance of the claim of Winifred R. Burrow against the estate of Fred H. Wessels, deceased. We affirm.
Since the manifest weight of the evidence is an issue in this appeal, we shall set out in some detail the evidence presented at trial as reflected in the record. Four witnesses testified at trial: Shanda Jaremus, adult daughter of the claimant; Milo J. Fleming, the attorney who drafted the document forming the basis of this claim; Helen Hawthorne, secretary to Mr. Fleming at the time the document was drafted; and Wesley J. Wessels, the objector bringing this appeal. For the most part, the testimony of all the witnesses was consistent.
Fred H. Wessels (Fred) was born on April 10, 1889. He owned and operated a farm in Iroquois County for much of his life. Sometime in or prior to 1959, Fred's daughter Winifred R. Burrow (Winifred) moved her trailer home onto Fred's farm. The trailer home was placed about 50 feet from Fred's house, and Winifred lived in the trailer home with her daughter Shanda. Fred's wife Theda died on January 14, 1966. Following Theda's death, Winifred quit her job with a company in the area and devoted herself to helping Fred in many ways, but especially by doing household chores such as cooking and cleaning and by assisting Fred in managing the house and the farm. Although Fred was almost 77 years old when his wife Theda died, at that time he was still healthy and actively farming at least part of his property. It was not until around 1973 or 1974 that Fred retired from active farming. By that time he had leased some of his farmland to his son Wesley J. Wessels (Wesley) and all or most of the rest to Wesley's son Martin A. Wessels (Martin).
Sometime in 1974 Winifred's daughter Shanda moved from the trailer into Fred's house. In May 1975, an expansive power of attorney was executed by Fred which appointed Winifred as his attorney in fact. Sometime in 1975 Winifred moved into Fred's house. Shanda moved out of Fred's house and away from the immediate area in March 1976, to live on her own. In September or October of 1976, Wesley and his son Martin entered into a written lease with Fred to farm all or most of Fred's farm. This lease was for Fred's lifetime. Wesley's uncontradicted testimony was that Fred understood this lease and its terms when Fred entered into it.
On December 6, 1976, Fred and Winifred met with Milo J. Fleming (Fleming), an attorney, at Fleming's office. (By that time Fred had been consulting Fleming on legal matters for almost 20 years, and over that time had come to see Fleming on legal matters on at least around 50 occasions.) The meeting had been arranged the day before when Fred and Winifred had been in Fleming's office on other legal business. Winifred drove Fred to this meeting, as Fred could no longer drive an automobile. At the meeting a discussion took place wherein Winifred expressed her concern that she be compensated for her services around the house and farm, including her taking care of Fred. (Testimony was divided as to whether this matter was the reason for the meeting, or whether the meeting was set up for another purpose and Winifred brought up this matter at the meeting on her own initiative.) Fred expressed his concern that he have enough assets available to pay expenses that could result from an injury or illness that might befall him. Fleming indicated that if Fred wished to compensate Winifred, subject to payment of expenses due to injury or sickness, there was a way to do that. That way was to enter into a contract for Winifred's services and to make the compensation payable at Fred's death, as a claim against Fred's estate. Fleming explained the estate tax consequences of such a course of action, under the estate tax law in force at that time. Fleming also stated that it was entirely up to Fred whether he wished to compensate Winifred. In reply, Fred indicated that if a contract could be drawn up that way, that that would be fine with him.
*1214 Fred, Winifred, and Fleming discussed at length the matter of a contract for Winifred's services. That discussion, which included the terms of the resulting document, took around two hours. Fred actively participated in specifying the provisions in the document, though he did obtain Winifred's agreement as each provision was being discussed. Much of the discussion between Fred and Winifred concerned what would be reasonable amounts to use for compensation. Various criteria were discussed, including the amount of money Winifred could earn in outside employment, the amount of money Fred would have to spend if he went into a nursing home, as well as the effects of inflation. Fleming dictated the document to his secretary Helen Hawthorne in the presence of Fred and Winifred, and had his secretary read it back to him, also in the presence of Fred and Winifred. After it was typed up, it was handed to Fred to read, and it was once again read to him, by either Fleming or his secretary. Fred did not suggest any corrections or changes during or after the three times the language in the document was read to him. He executed the two-page document at its end and at the bottom of the first page, and Fleming and his secretary witnessed it.
As executed, the document at issue states as follows:
"WHEREAS, my daughter, Winifred R. Burrow, since the death of my wife, Theda C. Wessels, on January 14, 1966, has lived in my home and taken care of it and kept it for me and has looked after me during my illnesses and declining years; and
WHEREAS, I have received and will receive said services, expecting to pay for the same; and
WHEREAS, I feel that she is entitled to compensation for her services to me;
NOW, THEREFORE, I acknowledge myself indebted to my said daughter, Winifred R. Burrow, in the amounts hereinafter set forth and I agree and promise to pay said Winifred R. Burrow the sums hereinafter set forth, namely:
1. For all services performed by her through December 31, 1976, the sum of SIXTY-SIX THOUSAND DOLLARS ($66,000.00) said sum representing approximately $500.00 per month for said period of time; and
2. The further sum of TWO HUNDRED DOLLARS ($200.00) per week for each week that she shall after December 31, 1976 live and remain in my home, until the date of my death, said monthly sum shall be payable regardless of whether or not I am in my said home or whether I may be in the hospital or in some other facility receiving medical services.
Said amounts hereinabove provided for shall be payable at my death and shall be allowed as a claim against my estate, one-half thereof being payable in the calendar year in which I shall die and the other half being payable on the second day of January of the year following the calendar year in which I shall die. All sums by me given Winifred R. Burrow during my lifetime shall be considered as gifts by me to her and shall not be used as an off-set or credit against the sums herein due.
The payments of the sums hereinabove provided for shall in no manner impair the share of my estate to be taken by said Winifred R. Burrow under my Last Will and Testament of February 28, A.D., 1966, and subject to the payment of this any my other debts, funeral expenses and costs of administration, I do hereby ratify and confirm my Last Will and Testament of February 28, A.D., 1966.
DATED this 6th day of December, A.D., 1976.
 /s/Fred H. Wessels
 Fred H. Wessels
/s/Helen Hawthorne
/s/Milo J. Fleming
Witnesses"
Fleming and his secretary testified at trial that at the time the document was composed and executed Fred had some difficulty hearing and seeing, but that in their opinion he understood the discussion and *1215 he understood the contents and effect of the document. Fleming testified that at the time the document was signed Fred did not seem to be in any way emotional nor did Fred act in any peculiar fashion. Both Fleming and his secretary testified that in their opinion Fred signed the document freely and voluntarily. After signing the document, Fred handed it to Winifred, who had been present throughout. Winifred in turn asked Fleming to keep it in the office safe, which he did until shortly before it was introduced as an exhibit at trial. Fred paid for Fleming's services in preparing the document, though he probably did so by signing a check prepared by Winifred, as was Fred's general practice for paying bills at that time.
Winifred continued to care for Fred from that time until shortly before he died on December 10, 1980. Winifred continued to maintain Fred's house until his death.
After Fred's death, Winifred filed a claim against Fred's estate for $107,000, the amount due under the terms of the document above quoted. Since Winifred was the executrix of Fred's estate, a special administrator was appointed to deal with the claim. The special administrator denied the claim and defended against it at trial. Also objecting to the claim at trial were several of Fred's other children, as well as the disinherited children of a deceased child of Fred who were contesting Fred's will in a separate action. After a bench trial, the circuit court allowed the claim and Wesley has appealed that decision.
The issues presented for review are (1) whether the decision of the circuit court was against the manifest weight of the evidence, and (2) whether valid consideration was present for that promise in the document at issue relating to past services performed by the claimant for the decedent.
Winifred has conceded that she was the dominant party in a fiduciary relationship with Fred. In Clark v. Clark (1947), 398 Ill. 592, 76 N.E.2d 446, involving an action to set aside conveyances and to impose a constructive trust, the Illinois Supreme Court discussed situations in which a fiduciary benefits from a transaction with the trusting party:
"When the existence of a fiduciary relation has been established the law presumes that any transaction between the parties, by which the dominant party has profited, is fraudulent. This presumption is not conclusive, but may be rebutted by clear and convincing proof that the dominant party has exercised good faith and has not betrayed the confidence reposed in him. * * * The mere existence of a fiduciary relation prohibits the one trusted from seeking or obtaining any selfish benefit for himself and affords a basis for fastening a constructive trust upon the property, in the absence of a sufficient showing that the transaction was not the result of, or attended by, an abuse of the confidence reposed.
* * * In cases where the evidence shows a fiduciary relationship, neither undue influence nor mental incapacity is necessary to be established in order to avoid the transaction. [Citation.] The question in all such cases is whether the dominant party who has obtained the benefit of the transaction has exercised good faith and not betrayed the confidence reposed in him. * * * If a conveyance was not procured through improper means attended with circumstances of oppression or overreaching, but was entered into by the grantor with full knowledge of its nature and effect and because of his or her deliberate, voluntary and intelligent desire, the existence of a fiduciary relation does not invalidate the transaction. [Citation.] Contracts and transactions between parties to a fiduciary relation, if open, fair and honest when deliberately made, are as valid as contracts between other parties." Clark, 398 Ill. at 601-03, 76 N.E.2d at 450-51.
The Illinois Supreme Court has recently addressed how presumptions are to operate in trials. That court stated:
"The prevailing theory regarding presumptions that Illinois follows and Diederich [v. Walters, 65 Ill.2d 95, 2 Ill.Dec. *1216 685, 357 N.E.2d 1128 (1976)] speaks about is Thayer's bursting-bubble hypothesis: once evidence is introduced contrary to the presumption, the bubble bursts and the presumption vanishes. [Citations.] It is consistent with the Thayer approach that the party producing evidence to rebut the presumption must come forward with evidence that is `sufficient to support a finding of the nonexistence of the presumed fact.' [Citation.] * * *
The amount of evidence that is required from an adversary to meet the presumption is not determined by any fixed rule. A party may simply have to respond with some evidence or may have to respond with substantial evidence. If a strong presumption arises, the weight of the evidence brought in to rebut it must be great. [Citation.]
* * * * * *
In Rizzo v. Rizzo (1954), 3 Ill.2d 291, 120 N.E.2d 546, this court reviewed a fiduciary relationship arising out of a partnership. After finding that a fiduciary relationship existed and the defendants benefited from it, the court determined that a presumption of undue influence arose from the confidential relationship of the partnership, since the dominant party had enjoyed a benefit due to his fiduciary status. That presumption having been raised, the court determined that the beneficiary must produce clear and convincing evidence in order to rebut that presumption. [Citation.]
* * * * * *
We therefore feel that as a matter of public policy an attorney [who drafts a will and stands to benefit from that will] must provide `clear and convincing' evidence to rebut the presumption of undue influence once it has been raised.
* * * * * *
Sufficient evidence has been produced to rebut the presumption of undue influence as a matter of law. However, the judge as the trier of fact must now weigh the evidence and consider any and all reasonable inferences that can be drawn from these facts, including the possible inference of undue influence." Franciscan Sisters Health Care Corp. v. Dean (1983), 95 Ill.2d 452, 462-66, 69 Ill.Dec. 960, 965-66, 448 N.E.2d 872, 877-78.
While the holding of the Illinois Supreme Court in Franciscan Sisters could be construed as only relating to attorney-client relationships, we agree with the Fourth District's view as expressed in Lamb v. Lamb (1984), 124 Ill.App.3d 687, 80 Ill.Dec. 8, 464 N.E.2d 873, that clear and convincing evidence is required to rebut the presumption of fraud or undue influence arising from transactions within any fiduciary relationship, not just those involving attorneys and their clients.
The evidence shows that Fred was 87 years old when the document was executed and that his sight and hearing were somewhat impaired. However, the evidence also shows that Fred's mind was still sharp, and that his overall health was good for a man his age. In particular, the evidence demonstrates that he was capable both of understanding the import of the document and of voluntarily and freely assenting to it, and that he did understand it and voluntarily and freely assented to it. Wesley himself testified that Fred understood the lease Fred signed only two or three months prior to Fred's signing of the document involved here. (That lease was of Fred's farm, and its term was the remainder of Fred's life.) It is not disputed that Winifred provided the services called for in the document, that the amounts of money noted in the document were reasonable in comparison to the value of the services, or that Fred derived substantial benefit from Winifred's services.
Despite arguments by Wesley that Fleming acted as attorney for Winifred rather than Fred, the evidence demonstrates clearly that Fred had been going to Fleming for legal advice for almost 20 years at the time the document at issue was executed, and Fleming had met with Fred concerning Fred's legal matters somewhere between about 50 and 100 times. Fleming had written a will for Winifred *1217 and had referred her to another attorney regarding her divorce, but that had been the extent of Fleming's legal work on Winifred's behalf up until the time the document was executed. The evidence shows that Fleming provided Fred independent legal advice and apprised Fred of the meaning and effect of the document at issue. Independent legal advice concerning a questioned transaction, when given to the trusting party of a fiduciary relationship, is significant evidence tending to rebut a presumption that the transaction is fraudulent or the result of undue influence. Cf. In re Estate of Wright (1964), 49 Ill.App.2d 196, 207, 199 N.E.2d 54, 59.
The appellate court must defer to the findings of fact of the circuit court unless they are contrary to the manifest weight of the evidence. (See Klaskin v. Klepak (1989), 126 Ill.2d 376, 389, 128 Ill. Dec. 526, 531, 534 N.E.2d 971, 976.) After reviewing the entire record, we find that the evidence strongly supports the circuit court's findings that Winifred rebutted the presumption of fraud or undue influence with clear and convincing evidence, that the document at issue was procured, formulated, and executed in good faith, and that the circumstances surrounding the document's procurement, formation, and execution involved no abuse of the confidence Fred reposed in Winifred.
The second issue is whether there was consideration for Fred's promise in the document to pay Winifred for services performed prior to the execution of the document. If prior to the execution of the document there had been no express or implied agreement between Fred and Winifred that Winifred would be compensated for her services, then (at least as this document is worded) consideration would be lacking for Fred's promise to pay Winifred for services rendered prior to the document's execution.
It is a general rule of law that services rendered by one member of a family for another, without a contract or agreement to pay for the same, or without a request for the services, are presumed to be gratuitous and do not constitute sufficient consideration to support a promise to pay for the same. (Meyer v. Meyer (1942), 379 Ill. 97, 103-04, 39 N.E.2d 311, 314.) In this case, the resolution of this second issue turns on the question of whether there had been, prior to the execution of the document and contemporaneous with Winifred's services, a contract or agreement between Fred and Winifred to pay for those services.
The document does have two significant legal effects: (1) it contains an offer to pay for future services by Winifred, which could be accepted only by performance of those services (resulting in a unilateral contract once acceptance occurred), and (2) it contains admissions that Fred had "received * * * [Winifred's] services, expecting to pay for the same" and that he "acknowledge[d] [himself] indebted to * * * Winifred * * * in the amounts hereinafter set forth."
Wesley argues that no evidence was presented tending to show that Winifred and Fred, prior to the execution of the document, expected that Winifred would be compensated for her services. The record contains testimony of Helen Hawthorne, Fleming's secretary, that for several months prior to the date the document was drawn up, Winifred and Fred had discussed in her presence the need to discuss with Fleming the matter of compensation of Winifred for her services. Of course, that evidence by itself would hardly be sufficient to demonstrate that from 1966 to 1976 Winifred and Fred proceeded under the expectation that Winifred was to be compensated for her services. However, the admissions in the document itself are the most significant pieces of evidence from which could be inferred the expectations of Fred and Winifred that Winifred would be compensated. Those admissions by themselves served to rebut any presumption that Winifred, as a close relative of Fred, provided her services gratuitously. Given that no evidence was put on to indicate that Winifred had ever intended to provide her services gratuitously, or that Fred had ever intended not to compensate Winifred for her services, the admissions in *1218 the document were about the only evidence on the point.
In the case of Baietto v. Baietto (1943), 319 Ill.App. 8, 48 N.E.2d 726, a situation similar to this one presented itself:
"It is claimed by the appellants that there is not sufficient evidence to show any contract between the father and sons and the grandsons to pay for their services which were rendered by them; that being close relatives of the father, the law presumes that the services would be gratuitous, and therefore the claimants have failed to overcome this presumption. * * * In the present case it will be observed that exhibit No. 3 is dated at Streator, on January 11, 1937. * * * The father then continues, `In memory of debts, I have to pay, that I owe, to my boys for work that they have done for me around the home, that I never have paid them.' The word `debt,' used by the father in exhibit No. 3 must be given its usual and customary meaning. It has been described as meaning, to pay that which is due from one person to another, or that which any one is obligated to pay. Before there could be any debt due, that the father would be obliged to pay to his sons and grandsons, there must have been a contract, or agreement of some kind in order to create the debt.
* * * Here, we have a solemn obligation of the father acknowledging a debt that he owes to his boys and reciting the amount that he owes to each of them, and why he owes the same. This was a declaration against interest to the estate and is sufficient proof of the amount that the estate owes to each of the claimants." Baietto, 319 Ill.App. 8, 12-13, 48 N.E.2d 726, 727-28.
Wesley seeks to distinguish Baietto on the basis that farm work was involved there, whereas personal services are involved here. Such a distinction might be significant in the absence of a written admission, since in general the more burdensome the work the less likely it was meant to be provided gratuitously (see In re Estate of Clausen (1977), 51 Ill.App.3d 18, 9 Ill.Dec. 48, 366 N.E.2d 162), but when a written admission is involved, as here, that distinction is not significant.
There was little evidence presented at trial pertaining to this issue of consideration for Winifred's services prior to execution of the document. No one alluded to this issue by way of questioning or by way of argument, though some of the testimony, while introduced to prove other things, related obliquely to this issue. There was sufficient evidence for the circuit court to have drawn inferences on the issue of whether Fred and Winifred had an agreement, concurrent with Winifred's rendition of services for Fred, that Fred would compensate Winifred for those services. Where several inferences may be drawn from the evidence, the reviewing court must accept that which supports the circuit court's decision. (See Klaskin v. Klepak (1989), 126 Ill.2d 376, 394-95, 128 Ill.Dec. 526, 534, 534 N.E.2d 971, 979.) Hence, we accept the inference that Fred and Winifred had an agreement all along that Winifred's services would be compensated. With such an agreement, Fred's promise in the document to pay for the services rendered by Winifred prior to the document's execution simply specified the amount, manner, and timing of the compensation which previously had been promised by Fred in return for Winifred's services. As such, that promise in the document was supported by sufficient consideration.
For the reasons expressed, we affirm the decision of the circuit court.
Affirmed.
HEIPLE, P.J., and SCOTT, J., concur.